UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                  :
UNITED STATES OF AMERICA,                         :
                                                  :
                       -v-                        :
                                                  :        22-CR-282 (VSB)
RUBEN AYALA,                                      :
                                                  :        **OPINION & ORDER**
                                   Defendant.     :
                                                  :
------------------------------------------------------------X

VERNON S. BRODERICK, United States District Judge:

       Defendant Ruben Ayala ("Defendant") is charged in four counts with (1) possessing

ammunition after being convicted of a felony, in violation of 18 U.S.C. § 922(g)(1);

(2) possessing a firearm after being convicted of a felony, in violation of 18 U.S.C. § 922(g)(1);

(3) possessing controlled substances with intent to distribute, in violation of 21 U.S.C. §§ 812,

841(a)(1), 841(b)(1)(C) and 841(b)(1)(D); and (4) possessing a firearm during and in relation to

a drug trafficking crime that may be prosecuted in a court of the United States, in violation of 18

U.S.C. § 924(c)(1)(A).  Before me is Defendant's motion to dismiss the § 922(g)(1) counts as

unconstitutional based on the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v.

Bruen*, 142 S. Ct. 2111 (2022).  Also before me is Defendant's motion to suppress the following

evidence pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C):  (1) the pre-trial

identifications by members of the New York City Department ("NYPD") of Defendant as

unreliable; (2) evidence obtained from a search of Defendant's person on April 25, 2022 due to

the violation of his Fourth Amendment rights; and (3) evidence obtained from Defendant's

Instagram account (the "Instagram Account") on the basis that the warrant application to search

the Instagram Account violated his Fourth Amendment rights.  (Doc. 34-1.)  Defendant also

moves for a pretrial evidentiary hearing pursuant to *United States v. Wade*, 388 U.S. 218 (1967),

relating to the identification procedures, and pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), relating to the Instagram Warrant.

Because I find that under binding Second Circuit precedent § 922(g)(1) is a valid constitutional restriction on the Second Amendment rights of convicted felons and is consistent with the historical tradition of firearms regulation in the United States, Defendant's motion to dismiss the § 922(g) counts as unconstitutional is DENIED.  In addition, because I find that the identification procedures employed by the NYPD were not unduly suggestive and that Defendant has not made the thresholding showing of suggestiveness to trigger a *Wade* hearing, Defendant's motion to preclude the identification evidence and request for a *Wade* hearing is DENIED. Finally, because I find that the Government established reasonable suspicion justifying Defendant's *Terry* stop and resulting search, and that the Instagram Warrant was supported by probable cause, was not overbroad, did not lack particularity, and did not contain any material misstatements or omissions justifying Defendant's request for a *Franks* hearing, Defendant's motion to suppress evidence seized during the searches is DENIED.

I.   **Factual Background**

A.   ***The September 6, 2021 Shooting***

On or about September 6, 2021, following a verbal dispute, a shooting occurred in the Bronx.  Surveillance footage captured the suspect shoot the victim in the stomach and then fire three more shots as the victim ran away before the suspect put on an orange ski mask and fled. The Government contends that Defendant is the suspect depicted on the surveillance videos from September 6, 2021, a fact that Defendant disputes.  (Def.'s Mem. 1–2[1]; Gov.'s Opp. 1[2].)

---

[1] "Def.'s Mem." refers to the Memorandum of Law in Support of Defendant Ruben Ayala's Pretrial Motions.  (Doc. 34-1.)

[2] "Gov.'s Opp." refers to the Government's Opposition to Defendant Ruben Ayala's Pretrial Motions.  (Doc. 35.)

### B.     *The Photo Identifications of the Defendant*

On September 27, 2021, law enforcement approached Ayala's parole officer to determine if she could identify Ayala as the shooter in the surveillance videos from the September 6, 2021 shooting; she could not.  (Def.'s Mem. Ex. A.[3])  Later that day, Detective Gary Porter ("Porter"), accompanied by Detectives Boyer and Reyes, went to the 41st Precinct to discuss the shooting, including by informing Lieutenant Popovic that Porter was attempting to present the case federally, that Mr. Ayala's parole officer could not identify Ayala on the surveillance videos, and that although law enforcement had attempted to speak with the victim, the victim had been uncooperative.  (*Id*. Ex. B.)

On October 5, 2021, Porter called Detective Evan Cruz ("Cruz"), who was one of the officers who had previously arrested Defendant on June 27, 2019 for gang assault, and asked him to "come view a video of someone he may recognize but did not disclose any details."  (*Id*. Ex. C.)  Cruz was shown a video depicting Defendant the day of the September 6, 2021 shooting. (*Id*.)  After viewing the video, Cruz stated that he "kn[ew] that person but [could not] remember his name," that he "remember[ed] arresting him a few years ago for gang assault," and that he is a "shooter."  (*Id*.)  Porter then asked Detective Boyer, who had no knowledge of the case, to administer a photo array containing six photographs, including one photo of Defendant.  (*Id*.) Cruz identified Defendant from the photo array.  (*Id*.)  On November 2, 2021, a second detective, Detective David Kelly, viewed the same video of the September 6, 2021 shooting, and later that day identified Defendant in a six-person photo array.  The photo array procedure was not recorded on videotape.  (*See id*. Ex. D.)

---

[3] "Def.'s Mem. Ex." refers to the Exhibits submitted in connection with the Memorandum of Law in Support of Defendant Ruben Ayala's Pretrial Motions.  (Doc. 34-2.)

C.    *The April 25, 2022 Arrest*

On or about April 25, 2022, an individual called 911 reporting that another individual had been robbed at gunpoint roughly 10 minutes prior.  (Def.'s Mem. 4.)  The individual provided the 911 operator his last name, his phone number (though he omitted the last digit), reported that the individual who had been robbed was his brother, and explained that his brother had been attempting to purchase marijuana from the robber-dealer.  (Gov.'s Opp. 4.)  The caller explained that after the robbery, the suspect ran into a deli located on Anthony Avenue and East Tremont Avenue.  (*Id.*)  The 911 caller described the suspect as "in his 20s and dressed in black sweatpants, black hoodie, white sneakers, and a white vest."  (*Id.*)

Approximately five minutes after the 911 call, three NYPD officers (the "Officers") entered the deli located on Anthony Avenue and East Tremont Avenue and reported smelling "an extremely strong odor of marijuana" once inside.  (*Id.*)  The Officers then approached Defendant, whose clothing—black sweatpants, a black hoodie, white sneakers, and a white vest—matched the description of the suspect provided by the 911 caller.  Defendant was the only person in the store wearing clothes matching the description provided by the 911 caller.  (*Id.*)  After one of the Officers put his hand on Defendant's lower back, Defendant "immediately attempted to leave," and another Officer removed Defendant's bag and began to pat him down.  (*Id.*)  During the pat down, Defendant reached his right hand to his front side vest pocket, and one of the Officers reached his hand in that area and felt a hard object in Defendant's pocket that appeared to be a firearm.  (*Id.*)  After Defendant tried to remove the Officer's hand and became combative, he was placed into a "bear hug" by the Officer standing behind him.  (*Id.*)  The search of Defendant resulted in "the seizure of a 9mm firearm, a quantity of cocaine base and approximately $580 in U.S. currency."  (*Id.* at 5; Def.'s Mem. 2.)

### D.       *The Porter Affidavit and Instagram Search Warrant*

After Defendant's arrest on April 25, 2022, the Government applied for and secured a search warrant seeking evidence from an Instagram account thought to be associated with Defendant.  On or about May 4, 2022, Magistrate Judge Gabriel W. Gorenstein issued the warrant, authorizing the search of the Instagram account "g5ru_."  (Def.'s Mem. Ex. G, pp. USAO_034247–USAO_034252, (the "Instagram Warrant").)  The Instagram Warrant authorized the Government to search the Instagram Account for "fruits, evidence, and instrumentalities of narcotics conspiracy, in violation of Title 21, United States Code, Sections 846 and 841; firearms offenses, in violation of Title 18, United States Code Sections 924(c); and felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)" (the "Subject Offenses").  Detective Porter submitted an affidavit in support of the Instagram Warrant setting forth the probable cause to believe that the Instagram Account contained evidence of the Subject Offenses.  (Def.'s Mem. Ex. G, pp. USAO_034230–USAO_034246, (the "Porter Affidavit").)

The Porter Affidavit explained that although the Instagram Account was set to private, the profile picture is of Ayala.  (Porter Affidavit ¶ 23.)  The Porter Affidavit then detailed the facts that establish the existence of probable cause to believe that Ayala committed the September 6, 2021 shooting, including, among other things:  (1) Detective Porter's review of a still image from surveillance footage on the day of the shooting and a mugshot of Defendant; and (2) the identification by two detectives of Defendant in a photo array after having reviewed surveillance footage, identified in the Porter Affidavit as "Detective-3" and "Detective-4," both of whom had previously arrested Defendant on or about September 4, 2019 and June 27, 2019, respectively.  (*Id*. ¶¶ 13–15.)  In addition, the Porter Affidavit detailed that when Defendant was arrested on April 25, 2022, officers recovered from his person a loaded SCCY Industries 9mm

caliber firearm with a bullet in the chamber, crack cocaine, and $580 in United States currency. (*Id.* ¶¶ 19–20.)  The Porter Affidavit further described that Defendant had posted a rap video of himself with the same firearm that he was arrested with on April 25, 2022, which was still publicly accessible as of April 10, 2022.  (*Id.*¶ 23.)

After reviewing the Porter Affidavit, Judge Gorenstein approved and signed the Instagram Warrant, requiring social media platforms operated/owned by Meta, the parent company of Instagram, to disclose to the Government certain information associated with the Instagram Account.  The Instagram Warrant specified the timeframe it covered, January 1, 2021 through April 25, 2022, as well as the categories of information that law enforcement personnel were authorized to review as potential "evidence, fruits, and instrumentalities" of the Subject Offenses.  (*See generally* Instagram Warrant.)

## II.   **Procedural History**

On May 18, 2022, Defendant was indicted and charged in four counts with (1) possession of ammunition on or about September 6, 2021, after a felony conviction; (2) possession of a firearm on or about April 25, 2022, after a felony conviction; (3) possession with intent to distribute cocaine base and marijuana for renumeration on or about April 25, 2022; and (4) using and carrying a firearm on or about April 25, 2022, during and in relation to a narcotics offense. (Doc. 1.)  On September 8, 2022 Defendant's prior counsel filed a motion to suppress the firearm, cocaine base, and currency seized at the time of his arrest, (Doc. 12), as well as an accompanying memorandum of law, (Doc. 14), an attorney declaration, (Doc. 13), and on September 23, 2022, Defendant's affidavit in support of his motion, (Doc. 17).  I denied Defendant's motion in its entirety on January 12, 2023.  (Doc. 22, ("Prior Opinion").)

On January 26, 2023, prior counsel filed a letter indicating that there had been "a complete breakdown" in his communication with Defendant that he did not believe would improve.  (Doc. 23.)  As a result, on February 1, 2023, I relieved prior counsel and appointed Carla Marie Sanderson to represent Defendant.

On August 28, 2023, Defendant filed the instant motion to dismiss and motion to suppress, (Doc. 34), a memorandum of law, (Doc. 34-1), and exhibits, (Doc. 34-2.)  On October 2, 2023, the Government filed its memorandum of law in opposition, (Doc. 35), and Defendant filed his reply on October 16, 2023, (Doc. 36.)

III.   **Discussion**

A.  ***Motion to Dismiss Counts One and Two of the Indictment***

Defendant advances both facial and as-applied challenges to the two § 922(g)(1) counts. For the reason set below, both challenges fail.

**1.  Legal Standard**

The Second Amendment recognizes "an individual right to keep and bear arms for self-defense."  *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2125 (2022).  "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  *Id*. at 2126.  For a regulation of such conduct to pass constitutional muster, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."[4]  *Id*. at 2130.  The framework for assessing whether a regulation is "consistent with the Nation's historical tradition of firearm regulation" differs according to the nature of the problem the regulation is meant to

---

[4] *Bruen* replaced the so-called means-end scrutiny of the regulation previously adopted by the Supreme Court.  *See id*. at 2111.

solve.  *Id*. at 2130–32.  "For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  *Id*. at 2131.  However, "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."  *Id*. at 2132.

"When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy."  *Id*.  "[A]nalogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin."  *Id*. at 2133.  In other words, "a modern-day regulation" need not be "a dead ringer for historical precursors" to survive constitutional scrutiny.  *Id*.  Instead, the regulations must be "relevantly similar" in light of "at least two metrics:  how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id*. at 2132–33.

## 2.  Application

### a.  Defendant's Facial Challenge

Defendant first argues that the historical analysis required by *Bruen* renders § 922(g)(1) facially unconstitutional because the government cannot establish that the statute is "consistent with the nation's tradition of firearm regulation."  (Def.'s Mem. 7.)  However, in *United States v. Williams*, No. 23-CR-218, 2023 WL 8355891, at *5 (S.D.N.Y. Dec. 1, 2023), I considered and rejected an identical facial challenge, holding that *Bruen* does not undermine § 922(g)(1) for two independent reasons.  First, I held that § 922(g) is constitutional under binding Second Circuit precedent.  Specifically, I explained that the Second Circuit's decision in *United States v. Bogle*, 717 F.3d 281 (2013), which adopted the dicta in *Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), in holding that "§ 922(g)(1) is a

constitutional restriction on the Second Amendment rights of convicted felons" was undisturbed by *Bruen*.  *Williams*, 2023 WL 8355891, at *3 (quoting *Bogle*, 717 F.3d at 281–82).

Second, and independent of *Bogle*, I held that "the Government has met its burden of demonstrating a historical tradition of firearms regulation that is sufficiently analogous to § 922(g)(1) to uphold the statute's legitimacy." *Id*. at *4.  Although I rejected the argument by the Government in *Williams*, also advanced here, that "there is no basis for reading 'the people' in the text of the Second Amendment to exclude felons," I nonetheless found that the "historical record [] demonstrates that legislatures historically disqualified categories of persons from possessing firearms, just as felon-dispossession statutes do today." *Williams*, 2023 WL 8355891, at *4–5.

Here, the Government has similarly met its burden.  Defendant's motion does not raise any new arguments or issues that would compel me to reconsider any aspect of the historical record, or my analysis of that record's import, as set forth in detail in *Williams*.  Moreover, Defendant fails to even address the Second Circuit's holding in *Bogle*, let alone argue that *Bogle* is no longer good law, nor does Defendant contend that *Bruen* disturbs the dicta in *Heller* and *McDonald* that *Bogle* adopted.  Instead, by acknowledging that "courts in this district have addressed the constitutionality of § 922 post-*Bruen* and ruled that the statute does not violate the Second Amendment on its face," Defendant effectively concedes that his facial challenge must fail.  (Def.'s Mem. 6 n.6.)  Indeed, although the Second Circuit has yet to address the constitutionality of § 922(g)(1) post-*Bruen*, courts in this District have repeatedly rejected facial challenges on substantially the same grounds.  *See, e.g., United States v. Petteway*, No. 24-CR-80, 2024 WL 3105006, at *1 (S.D.N.Y. June 24, 2024) (holding that the Circuit's holding in "*Bogle* remains good law in the wake of *Bruen*"); *United States v. Cruz*, No. 24-CR-145, 2024

WL 2867460, at *2 (S.D.N.Y. June 5, 2024) ("Every court in this District that has considered whether *Bogle* survives *Bruen* has reached the same conclusion," and collecting cases); *United States v. Then*, No. 24-CR-73, 2024 WL 1809254, at *1 (S.D.N.Y. Apr. 25, 2024) ("[E]ven under *Bruen*'s analytical framework, the Government ha[s] 'met its burden of demonstrating a historical tradition of firearms regulation that is sufficiently analogous to § 922(g)(1) to uphold the statute's legitimacy.'" (quoting *United States v. Davila*, 688 F. Supp. 3d 81, 85 (S.D.N.Y. 2023)); *United States v. Crawford*, No. 23-CR-566, 2024 WL 1657879, at *3 (S.D.N.Y. Apr. 17, 2024) ("Section 922(g)(1) is nonetheless constitutional because Bruen permits restrictions on Second Amendment rights as long as they are "consistent with this Nation's historical tradition of firearm regulation." (quoting *Bruen*, 597 U.S. at 17)).  Moreover, in *United States v. Rahimi*, No. 22-915, 602 U.S. __ (U.S. June 21, 2024), the Supreme Court recently held that 18 U.S.C. § 922(g)(8), which prohibits an individual subject to a domestic violence restraining order from possessing a firearm, is facially constitutional.  In holding that the Government is free to "disarm individuals who present a credible threat to the physical safety of others," *Rahimi*, slip op. at 16, the Court held that its decisions in *Heller* and *Bruen* do not help Rahimi, endorsing *Heller*'s statement that "many . . . prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful,'" *id.*, slip op. at 15 (quoting *Heller*, 554 U.S. at 626, 627, n.26).  Thus, the Supreme Court's holding makes clear that *Heller* and *McDonald*, still apply post-*Bruen*.  Accordingly, Defendant's facial challenge fails.

### b.  Defendant's As-Applied Challenge

Defendant next argues that § 922(g)(1) is unconstitutional under the Second Amendment as applied to his case.  As an initial matter, and as noted by the Government, Defendant does not identify any binding authority suggesting that § 922(g)(1) is "subject to an as-applied Second

Amendment challenge by convicted felons." (Gov't. Opp. 26 (citing *Bogle*, 717 F.3d at 282–283).) Indeed, both the Eighth and Tenth Circuits have concluded that as-applied challenges are foreclosed because Section 922(g)(1) is constitutional in all of its applications, and courts in this District that have considered this issue have acknowledged the logic of the reasoning of those Circuits in finding that "there is no basis to draw distinctions under § 922(g)(1) based on the underlying felony conviction." *Crawford*, 2024 WL 1657879, at *5 (citing *Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir. 2023) ("In preserving 'shall-issue' regimes and related background checks [in *Bruen*], the Court arguably implied that it was constitutional to deny firearm licenses to individuals with felony convictions.") and *United States v. Jackson*, 69 F.4th 495, 505–06 (8th Cir. 2023) (rejecting as-applied challenge to 922(g)(1) after reviewing the history and tradition of firearms regulation and considering "the Supreme Court's assurances that recent decisions on the Second Amendment cast no doubt on the constitutionality of laws prohibiting the possession of firearms by felons").)

Defendant's reliance on *Range v. Attorney General United States of America*, 69 F.4th 96 (3d Cir. 2023) (en banc) is misplaced. There, the Third Circuit sustained a post-*Bruen* as-applied challenge to § 922(g)(1) brought by an individual who had been previously convicted of making a false statement to obtain food stamps, a nonviolent felony. *Id*. I decline to follow the reasoning of *Range*, which is both non-binding and an "outlier" in permitting an as-applied challenge to § 922(g)(1). *Crawford*, 2024 WL 1657879, at *5 (quoting *United States v. Sternquist*, No. 22-CR-473, 2023 WL 6066076, at *8 (E.D.N.Y. Sept. 15, 2023)).

Despite the lack of binding authority, Defendant's as-applied challenge to § 922(g)(1), even if viable, must fail. Defendant was convicted of attempted criminal possession of a weapon in the second degree, in violation of N.Y. Penal Law § 265.03(3). (Def.'s Mem. 5; Gov't Opp.

29–30.)  This conviction, which serves as the predicate for the § 922(g)(1) charge, is a "quintessential crime of violence."  *See United States v. Rowson*, 652 F. Supp. 3d 436, 455 n.12 (S.D.N.Y. 2023) (characterizing § 265.03 as a violent felony).  Thus, because Defendant was convicted of a violent felony, he is "squarely within the class of people whose Second Amendment rights may be restricted."  *Crawford*, 2024 WL 1657879, at *5; *United States v. King*, 634 F. Supp. 3d 76, 83 (S.D.N.Y. 2022) (same); *see also United States v. Sanders*, No. 23-CR-78, 2023 WL 8790309, at *4 n.6 (E.D.N.Y. Dec. 19, 2023) ("[N]umerous decisions within this Circuit [have rejected] the argument that 922(g)(1) is unconstitutional as applied to an individual . . . with a prior violent felony." (internal quotation marks and alterations omitted)).

Lastly, to the extent that Defendant's as-applied challenge is rooted in his contention that 922(g)(1) is unconstitutional as-applied to him because his conviction under N.Y. Penal Law § 265.03(3)—which serves as the predicate felony offense for the § 922(g) charge—is itself unconstitutional in light of *Bruen*, this argument also fails.  (Def.'s Mem. 8–10.)  First, as the Government argues, I "need not consider this argument in light of the defendant's independent robbery and burglary convictions."  (Gov't. Opp. 30 n.10.)  In addition, the Government characterizes this argument as an "end-run around the settled rule that a defendant in a Section 922(g)(1) prosecution may not collaterally attack, even on constitutional grounds, a prior felony conviction."  (*Id.* (citing *Lewis v. United States*, 445 U.S. 55, 65, 67 (1980) (felon-in-possession prosecution "does not open the predicate conviction to a new form of collateral attack," even if "the predicate felony may be subject to collateral attack on constitutional grounds")).)  I agree.  Defendant provides no support for his collateral attack of his underlying state conviction.

Therefore, Defendant's as-applied challenge to § 922(g)(1) fails, and Defendant's motion to dismiss the two 922(g)(1) counts is DENIED.

### B.     *Motion to Suppress Identification Evidence*

Defendant also moves to suppress identification evidence obtained pursuant to procedures initiated by the NYPD, contending that the identifications are "unreliable" because the "procedures used were unduly suggestive, prejudicial, and violated Mr. Ayala's due process rights." (Def.'s Mem. 10.)

### 1.  Applicable Law

Although evidence of a prior identification is generally admissible under the Federal Rules of Evidence, courts must exclude prior identifications that are "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *United States v. DiTommaso*, 817 F.2d 201, 213 (2d Cir. 1987) (internal quotation marks omitted). If a pretrial identification that has been "infected by improper police influence" such that it results in a "very substantial likelihood of irreparable misidentification," then a court "must disallow presentation of the evidence at trial." *Perry v. New Hampshire*, 565 U.S. 228, 232, 237–38 (2012) (internal quotation marks omitted). To determine whether pretrial identification evidence should be precluded, courts engage in a two-step "sequential inquiry." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). First, the Court examines whether the pretrial identification procedures by which the identification was obtained were "unduly suggestive of the suspect's guilt." *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990). If not, there is "no due process obstacle to admissibility" and the reliability of the identification becomes "a matter for the jury." *Raheem*, 257 F.3d at 133 (internal quotation marks omitted). If the court determines, however, that the procedures were suggestive, it must then determine whether the identification was independently reliable. *See id*.

The Court may exercise its discretion to hold an evidentiary hearing on the admissibility of identification evidence. *See United States v. Wade*, 388 U.S. 218 (1967). The Supreme Court has made clear that there is no per se rule requiring a *Wade* hearing to determine the admissibility of identification evidence. *See United States v. Archibald*, 734 F.2d 938, 940 (2d Cir.) (citing *Watkins v. Sowders*, 449 U.S. 341, 349 (1981)). A defendant may not "baldly request" a hearing; rather, a defendant must make a "threshold showing" by alleging specific "facts supporting his contention that the identification procedures used were impermissibly suggestive." *United States v. Berganza*, No. 03-CR-987, 2005 WL 372045, at *10 (S.D.N.Y. Feb. 16, 2005).

## 2.  Application

Defendant does not challenge the composition of the photo-array, but instead attacks the manner in which law enforcement conducted the identification procedure. (Def.'s Mem. 10). In so arguing, Defendant characterizes the allegedly unduly suggestive procedures employed as "atypical." (Def.'s Reply 6.) Nothing in the record supports this contention, and Defendant has not met the thresholding showing of suggestiveness to trigger a *Wade* hearing.

As an initial matter, Defendant asserts that there are "no grounds" to conclude that the identification procedures used here were "proper," and that the Government's argument otherwise is "speculat[ive]." (Def.'s Mem. 6). However, in making this argument, Defendant misstates the parties' respective burdens. In moving to suppress identification evidence, it is Defendant who must allege—with specificity—that the identification procedures were conducted improperly. *See United States v. Castellano*, 610 F. Supp. 1359, 1439 (S.D.N.Y. 1985) ("A defendant who seeks to suppress evidence bears the burden of showing that disputed issues of material fact exist before an evidentiary hearing is required."). None of Defendant's purportedly

14

specific facts meet the threshold of suggestiveness.  Specifically, Defendant alleges that the following demonstrate improprieties in the identification procedures used:  (1) the officers did not consent to audio record the procedure, which Defendant contends violates NYPD protocols; (2) the officers did not properly document the procedures and blind procedures were not conducted; (3) Porter falsely stated that Boyer had no knowledge of the case when he had, in fact, accompanied Porter to speak with Ayala's parole officer on September 27, 2021; and (4) because these protocols were violated, Porter's claim that both Cruz and Boyer identified Ayala with no prior knowledge of the case is "not credible".  (Def.'s Mem. 11.)  All of these assertions rely on conjecture and assumptions for which Defendant has failed to offer any factual support.  Defendant does not point to, for example, any comments by Porter that may be characterized as suggestive or that supplied Cruz or Boyer with previously unknown facts about Defendant.  *See United States v. Muhanad Mahmoud Al-Farekh*, 956 F.3d 99, 112 (2d Cir. 2020) (noting that although there is no "bright-line rule," district courts should consider, among other factors, "the utterance of suggestive comments by interrogators to the witness to obtain an identification that is jointly constructed by supplying the witness with previously unknown facts about the suspect . . . ").  The officers' decision not to consent to audio recording does not appear to violate any NYPD protocols, nor does Defendant offer any factual support for his argument that the officers failed to properly document the procedures.  Similarly, Defendant's argument that the identifications made by Cruz and Boyer cannot be deemed "credible" unless the officers were provided "additional information" is circular and conclusory.  (Def.'s Mem. 11). Defendant has not alleged any specific facts that suggest these officers were, in fact, furnished with information to assist in their respective identifications.

15

Because Defendant has failed to make the requisite showing of suggestiveness, I find that Defendant has failed to support his argument that he is entitled to a *Wade* hearing.  In arguing that the manner in which law enforcement conducted the identification procedure was unduly suggestive, Defendant cites *United States v. Padilla*, No. 94-CR-313, 1994 WL 681812 (S.D.N.Y. Dec. 5, 1994).  As *Padilla* makes clear, however, absent "a sufficient pre-trial showing of impropriety, exploration of the circumstances surrounding the identification procedures may be properly left to cross-examination at trial."  *Padilla*, WL 681812, at *8. Similar to the court in *Padilla*, I find that Defendant can "adequately test[]" his "suspicion of improprieties" through cross-examination at trial.  *Id*.  Moreover, as explained by the Government, it is not only perfectly reasonable that Cruz and Boyer were able to identify Defendant based on their previous encounters with him, but absent any specific evidence that the procedures were unduly suggestive, and because courts in this district routinely deny requests for *Wade* hearings where defendants allege insufficient facts, Defendant will not be permitted to probe further.  *See, e.g., United States v. Keith*, 183 F. Supp. 3d 427, 434 (S.D.N.Y. 2016) (denying defendant's request for a *Wade* hearing because "a defendant must 'allege facts supporting his contention that the identification procedures used were impermissibly suggestive' and may not request a hearing merely to 'develop a factual record,'" (quoting *United States v. Williams*, No. 13-CR-580, 2014 WL 144920, at *1–*2 (S.D.N.Y. Jan. 15, 2014))); *see also United States v. Salomon-Mendez*, 992 F. Supp. 2d 340, 343 (S.D.N.Y. 2014) (denying defendant's request for a *Wade* hearing where defendant claimed he was "unable to know whether the procedures used were improper without a hearing on the matter").  Accordingly, I conclude that the identification procedures were not unduly suggestive, and Defendant's motion to preclude the identification evidence, and his request for a *Wade* hearing, is DENIED.

### C.     *Motion to Suppress Evidence Obtained From April 25, 2022 Search*

In my Prior Opinion, I rejected Defendant's previous argument that the search of

Defendant was invalid, finding that the Government had established reasonable suspicion for the

Officers' *Terry* stop and frisk of Defendant and that he was arrested based on probable cause.

(Prior Opinion 6.)  My finding was based on the determination that the Officers' conduct was

reasonable considering the information communicated through the 911 call.  (*Id*. at 5.)[5]  In

finding the Officer's reliance on the 911 call reasonable, I also deemed the 911 call reliable

based on facts that supported the veracity of the 911 call and the identity of the 911 caller.

As with Defendant's prior motion, there remains "little to no dispute that on April 25,

2022, the Officers responded to a 911 call reporting a robbery at gunpoint where the caller

provided a description of the clothing and location of the suspected robber."  (Prior Opinion at

5.)  Similarly, there remains no dispute that Defendant was the only person in the deli at the time

matching the description provided by the 911 caller, and that a strong odor of marijuana was

reported by the Officers.  (*Id*.)

In the instant motion, Defendant asks me to reconsider my finding that the Officers'

*Terry* stop and frisk was supported by reasonable suspicion, alleging that the Government has

not established that the Officers' had sufficiently reliable information because the Government

has not established what specific information was conveyed to the Officers from the 911 call

before the stop.  (Def.'s Mem. 12–13)  In response, the Government first argues that Defendant

has failed to provide any new material facts sufficient to justify relitigating my prior ruling,

(Gov.'s Opp. at 39), and then points to an ICAD report that was provided to the Officers—

---

[5] I also noted that Defendant attempted to leave when approached by the officers, and "[u]nusual, evasive, or furtive behavior, especially in the presence of law enforcement" may enhance reasonable suspicion.  (Prior Opinion 6 (citing *United States v. Weaver*, 9 F.4th 129, 148 (2d Cir. 2021)).)  Nothing in Defendant's instant motion undermines this finding.

specifically referred to as the "arresting officers"—before the *Terry* stop, which it claims contained "all the information necessary" to establish reasonable suspicion.  (*Id*. at 40)   In reply, Defendant argues that the ICAD report the Government points to does nothing to cure the information deficiency, as the report does not demonstrate what information was conveyed by the police dispatcher receiving the report to the arresting officers before they approached Mr. Ayala. (Def.'s Reply 11.)

Defendant essentially asks me to consider whether there is an information gap between what information was conveyed from the 911 caller to the 911 dispatcher, and what information was, in turn, conveyed to the Officers who arrested him.  Defendant claims that an evidentiary hearing is necessary to fill that gap.  I disagree.  As in initial matter, if Defendant's claims were sufficient to warrant a hearing, every defendant arrested on the basis of information relayed by a 911 caller to a 911 dispatcher—who in turn provides that information to officers who then make an arrest—would be entitled to a hearing.  Defendant has not identified case law to support such a result.

In any event, although Defendant's instant motion raises a new basis on which to consider the information relied upon by the Officers that justified their *Terry* stop, Defendant's argument must fail.   The ICAD report conveys all of the material information that I relied on previously in finding reasonable suspicion.  Specifically, the ICAD report conveys the following:

- "third party caller sts mle robbed his brother and has guns"

- "mc sts loc is Anthony/E Tremont"

- "perp—mh—blk sweatpants, blk swat hoodie, white vest—white snkrs— in his 20's"

18

(Def.'s Mem. Ex. F at 20:42:50, 20:45:51, 20:46:26.)  As the Government argues, the record

plainly demonstrates "information-sharing" between the 46th Precinct and the arresting officers,

which is "evident on the face of the ICAD report, which shows the responding officers from the

46th Precinct communicating with the 911 operator and each other."  (Gov.'s Opp. 40 (citing

Def.'s Mem. Ex. F at 20:50:31, 20:52:56, and 20:57:47 (showing the responding officers noting

that this is the "Auth of 46 PS1," a "Sgt [is] on scene," and "Confirmed . . . firearm recovered

[sic]")).)

 However, even if the ICAD report itself did not establish the arresting officers'

knowledge of the facts justifying the *Terry* stop, under the doctrine of imputed knowledge, the

arresting or searching officer is not required to know the "specific information" necessary for

reasonable suspicion if "other law enforcement officials initiating or involved with the

investigation" knew "sufficient information to justify the arrest or search."  (*Id*. at 38 (quoting

*United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) *citing United States v. Hensley*, 469

U.S. 221, 230-33 (1985)).)

 Because I find that the information reflected in the ICAD report was either

communicated directly to the arresting officers, or can be imputed to them, there is no

information lacking from the ICAD report that would call into question my prior finding.  In

other words, Defendant has failed to establish that there is, in fact, any information gap between

what was provided by the 911 caller to the 911 dispatcher and what was provided by the 911

dispatcher to the Officers.  With regard to Defendant's argument that I must hold an evidentiary

hearing to determine what information was conveyed by the police dispatcher receiving the

report to the arresting officers before they approached Defendant, this argument similarly fails in

light of both the factual record and the imputation doctrine.  Therefore, I find that the

Government has established reasonable suspicion and that Defendant has not presented a factual dispute necessitating a hearing.  Accordingly, Defendant's motion to suppress evidence seized at the time of his arrest is DENIED.

> **D.**     ***Motion to Suppress Evidence Obtained From Defendant's Instagram Account***

Defendant next moves to suppress the evidence obtained from his Instagram Account, arguing that the Instagram Warrant was not supported by probable cause, was overbroad, and lacked particularity.  In the alternative, Defendant requests that I hold a *Wade* hearing due to the alleged misstatements and omissions in the Porter Affidavit.  As discussed below, Defendant's challenges are meritless.

> ### 1.   Privacy Interest and Probable Cause

> > a.   Applicable Law

According to the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  "A defendant seeking to suppress the fruits of a search by reason of a violation of the Fourth Amendment must show that he had a 'legitimate expectation of privacy' in the place searched."  *United States v. Hamilton*, 538 F.3d 162, 167 (2d Cir. 2008) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)); *see also United States v. Villegas*, 899 F.2d 1324, 1333 (2d Cir. 1990) ("A defendant has no right to have evidence suppressed on Fourth Amendment grounds unless the breached privacy expectation was his own rather than that of a third party.").  "This inquiry involves two distinct questions: first, whether the individual had a subjective expectation of privacy; and second, whether that expectation of privacy is one that society accepts as reasonable."  *Hamilton*, 538 F.3d at 167 (citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).

It is axiomatic that "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas*, 439 U.S. at 130 n.1.  Accordingly, a defendant asking a court to suppress evidence must first demonstrate a legitimate expectation of privacy in the area that was searched. *See*, *e.g.*, *id.*; *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980); *see also United States v. Dore*, 586 F. App'x 42, 46 (2d Cir. 2014) ("As [the defendant] conceded below, he did not submit an affidavit establishing that the cell phones in question belonged to him or that he had a subjective expectation of privacy in them.  Nor did [the defendant] assert a privacy interest in the cell phones in some other manner.  Consequently, [the defendant] does not have standing to assert Fourth Amendment rights in those phone records.").

Next, in determining whether probable cause exists to support the issuance of a warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  The experience of the law enforcement agents involved in preparing the warrant application is particularly relevant to the analysis, as "experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not." *United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004); *see also United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) ("A number of cases have ruled that an agent's expert opinion is an important factor to be considered by the judge reviewing a warrant application.").  Ultimately, the probable cause determination is a "flexible common-sense" inquiry based on the totality of the circumstances. *Texas v. Brown*, 460 U.S. 730, 742 (1983).

In reviewing a magistrate judge's probable cause determination, reviewing courts must give "great deference" to the magistrate's findings.  *Gates*, 462 U.S. at 236 (internal quotation marks omitted); *see also United States v. Ventresca*, 380 U.S. 102, 109 (1965) ("Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.").  "[S]o long as the magistrate had a 'substantial basis for concluding' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more."  *Gates*, 462 U.S. at 236 (alterations omitted) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

b.  Application

Here, Defendant fails to submit an affidavit or declaration asserting his privacy interest in the Instagram Account.  Indeed, Defendant fails to even acknowledge the burden of establishing such a privacy interest, and his motion papers appear to assume his privacy interest despite his failure to make any affirmative showing.  *See Rawlings*, 448 U.S. at 104 (defendant bears the burden of proving that he had a legitimate expectation of privacy).  Defendant and the Government seem to agree that the Instagram Account was set to private, (Def.'s Mem. 22; Gov't. Opp. 52), which—as compared to when a social media user disseminates his postings and information to the public—"reflect[s] the user's intent to preserve information as private and may be constitutionally protected" under the Fourth Amendment, *United States v. Meregildo*, 883 F. Supp. 2d 523, 525 (S.D.N.Y. 2012).  However, Defendant does not even attempt to argue that this fact, or any other evidence, establishes his privacy interest in the Instagram Account.  Nor could he, as he is not permitted to "substitute legal conclusions for evidence."  *See United States v. Tennant*, No. 23-CR-79, 2023 WL 6978405, at *7 (N.D.N.Y. Oct. 10, 2023) (defendant

who argued that private social media messages are "inherently private" but failed to submit any evidence claiming ownership of the social media account, such as an affidavit, failed to establish a privacy interest). Moreover, in challenging probable cause, Defendant attempts to avoid admitting that the Instagram Account belongs to him. (Def.'s Mem. 21 ("While the profile photo of the Instagram account appeared to be Mr. Ayala, there was no information that Ayala created or ever used the Instagram account.").) Defendant could have asserted a privacy interest in the Instagram Account without concern that the Government would use such an admission against him, as it would not be admissible as substantive evidence of guilt at trial. *See Simmons v. United States*, 390 U.S. 377, 394 (1968); *see also United States v. Ulbricht*, No. 14-CR-68, 2014 WL 5090039, at *3 (S.D.N.Y. Oct. 10, 2014) ("Further, defendant could have established such a personal privacy interest by submitting a sworn statement that could not be offered against him at trial as evidence of his guilt (though it could be used to impeach him should he take the witness stand)."), *aff'd*, 858 F.3d 71 (2d Cir. 2017). His failure to do so is fatal to his suppression motion. Therefore, Defendant's motion to suppress evidence seized from the Instagram Account is DENIED.

Even assuming Defendant had established his privacy interest in the Instagram Account, I find that the Instagram Warrant was supported by probable cause. As an initial matter, Defendant does not dispute that the profile photo of the Instagram Account "appear[s] to be" him. (Def.'s Mem. 21.) Instead, Defendant attacks the Porter Affidavit's purported failure to provide a sufficient "nexus" between the suspected crimes and the Instagram Account, relying primarily on his suggestion that the Porter Affidavit was devoid of information "showing that Mr. Ayala created or used the account." (*Id.*) This argument is not only incorrect as a factual matter but evinces a fundamental misunderstanding of the law, as "[a] showing of nexus does not

require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (internal quotation marks omitted). Here, Defendant ignores several facts set forth in the Porter Affidavit that give rise to a reasonable inference that evidence, fruits, and instrumentalities of the subject offenses would be found in the Instagram Account. For example, Defendant publicly posted a rap video of himself brandishing the green firearm that was recovered from his person during the April 25, 2022 arrest, giving rise to the reasonable inference that Defendant was likely to post similar videos on his private Instagram. (Porter Affidavit ¶ 23.) In addition, Agent Porter opined that "based on his training and experience . . . individuals who engage in violent crimes such as shootings frequently communicate with coconspirators over social media about the offenses . . ." and about "acquiring and disposing of firearms, details of the shooting, and how to evade law enforcement detections," and that "individuals who engage in narcotics distribution frequently communicate with coconspirators and customers over social media." (*Id.* ¶ 24.) Contrary to Defendant's suggestion otherwise, these statements also give rise to a reasonable inference necessary to establish nexus. Defendant suggests that Detective Porter's training and experience cannot substitute for the lack of evidentiary nexus, but Defendant's reliance on an out of circuit case, *United States v. Ramirez*, 180 F. Supp. 3d 491, 495 (W.D. Ky. 2016), is misplaced. Courts in this Circuit routinely recognize the role of a law enforcement officer's training expertise in evaluating probable cause. *See Gaskin*, 364 F.3d at 457; *Fama*, 758 F.2d at 838 (2d Cir. 1985) ("A number of cases have ruled that an agent's expert opinion is an important factor to be considered by the judge reviewing a warrant application."); *Kaskel v. Compagnone*, 664 F. App'x 109, 111 (2d Cir. 2016) (finding that probable cause "must be evaluated in light of the training and experience of the investigating agent"); *United States v.*

*Cabrera*, No. 22-CR-10, 2023 WL 4305023, at *11 (S.D.N.Y. June 29, 2023) (warrant to search defendant's Instagram Account which was supported by agent-declarant's "properly invoked training and experience" supported reviewing judge's finding of probable cause); *United States v. Garlick*, No. 22-CR-540, 2023 WL 2575664, at *6 (S.D.N.Y. Mar. 20, 2023) (agent "properly invoked his training and experience investigating felons to supplement his account of the facts establishing probable cause").  Based on this evidence, I find that Magistrate Judge Gorenstein had a substantial basis to conclude that there was probable cause to issue the Instagram Warrant.

### 2.   Particularity and Overbreadth

Defendant next argues that the Instagram Warrant lacked particularity and was overbroad.  I disagree.

#### a.   Applicable Law

The Fourth Amendment requires, among other things, that search warrants "particularly describ[e] the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV; *see also United States v. Cohan*, 628 F. Supp. 2d 355, 359 (E.D.N.Y. 2009) ("A warrant . . . can be unconstitutionally infirm in two conceptually distinct but related ways:  either by seeking specific material as to which no probable cause exists, or by giving so vague a description of the material sought as to impose no meaningful boundaries.").  The particularity requirement "guards against general searches that leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized."  *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990); *see also United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) ("Particularity concerns frequently arise in circumstances where the description in the warrant of the place to be searched is so vague that it fails reasonably to alert executing officers to the limits of their search authority.").  "To be sufficiently particular under the Fourth Amendment, a warrant must satisfy

three requirements." *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017).  The warrant

must:  (1) "identify the specific offense for which the police have established probable cause";

(2) "describe the place to be searched"; and (3) "specify the items to be seized by their relation to

designated crimes."  *Id.* (internal quotation marks omitted).

  The level of specificity required by the Fourth Amendment depends on many factors,

*United States v. Jacobson*, 4 F. Supp. 3d 515, 522 (E.D.N.Y. 2014), and courts do not demand "a

perfect description of the data to be searched and seized," *Ulbricht*, 858 F.3d at 100.  Indeed,

"[s]earch warrants covering digital data may contain some ambiguity."  *Id.* (internal quotation

marks omitted); *see also United States v. Galpin*, 720 F.3d 436, 336 (2d Cir. 2013) ("[C]ourts

may tolerate some ambiguity in the warrant so long as law enforcement agents have done the

best that could reasonably be expected under the circumstances, have acquired all the descriptive

facts which a reasonable investigation could be expected to cover, and have insured that all those

facts were included in the warrant." (internal quotation marks omitted)).  In other words, "a

search warrant does not necessarily lack particularity simply because it is broad."  *Ulbricht*, 858

F.3d at 100.  The particularity requirement is satisfied if the warrant enables the executing officer

to ascertain and identify with reasonable certainty those items that the magistrate judge has

authorized him or her to seize.  *See United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992).

  "Although somewhat similar in focus, [overbreadth and particularity] are two distinct

legal issues:  (1) whether the items listed as 'to be seized' in the warrant were overbroad because

they lacked probable cause and (2) whether the warrant was sufficiently particularized on its face

to provide the necessary guidelines for the search by the executing officers."  *United States v.*

*Hernandez*, No. 09-CR-625, 2010 WL 26544, at *7 (S.D.N.Y. Jan. 6, 2010).

b. <u>Application</u>

Here, I find that the Instagram Warrant was sufficiently particularized. Although Defendant contends that the warrant was not particularized because it authorized seizing data over an 18-month period, that targeted timeframe was plainly justified given the nature and timing of the subject offenses. Indeed, courts in this Circuit routinely deem warrants sufficiently particular that lack any temporal limitation, agreeing that although "a time frame is relevant, [] there is no apparent consensus as to when one is required." *United States v. Arias-Casilla*, No. 21-CR-218, 2022 WL 2467781, at *6 (S.D.N.Y. July 6, 2022) (collecting cases).

The warrant also plainly satisfied the three basic elements of the particularity requirement. First, it identified the Subject Offenses as the offenses for which probable cause had been established. (Instagram Warrant at 3.) Second, it limited the data associated with the Instagram Account that could be searched in great detail. (*Id*. at 3–4.) Third, it identified which information could be seized as constituting evidence, fruits, and instrumentalities of the Subject Offenses, including by identifying specific subcategories of materials such as "communications with co-conspirators," "the location of the user[] of the Subject Account," "and subscriber information, in any form kept, pertaining to the Subject Account." (*Id*.) Thus, I find that the Instagram Warrant "link[ed] the evidence to the criminal activity supported by probable cause" and did "not give the agents broad authority to search for all evidence of the Subject Offenses without any limitation." *United States v. Ray*, 541 F. Supp. 3d 355, 389–90 (S.D.N.Y. 2021); *see also United States v. Pugh*, No. 15-CR-116, 2015 WL 9450598, at *22 (E.D.N.Y. Dec. 21, 2015) ("In general, warrants that limit a search to evidence relating to a particular crime, and which provide a list of examples as a means of limiting the items to be seized, are upheld when confronted with a particularity challenge." (citing *United States v. Riley*, 906 F.2d 841, 844 (2d

Cir. 1990))); *United States v. Lustyik*, 57 F. Supp. 3d 213, 227 (S.D.N.Y. 2014) (warrant was sufficiently particular where it "broadly describe[d] the items to be seized as 'evidence, fruits, or instrumentalities' of specified federal crimes" and also "set[ ] forth an illustrative list of items to be seized").  Based on the foregoing, I find that the Instagram Warrant was sufficiently particularized to permit law enforcement to "ascertain and identify with reasonable certainty" those items that Magistrate Judge Gorenstein had authorized law enforcement to search.  *George*, 975 F.2d at 75.

I also find that the Instagram Warrant was not overbroad.  Defendant attacks the Instagram Warrant claiming that it allowed for the search and seizure of information that Defendant characterizes as "far afield" from the Subject Offenses, such as "Instagram posts and non-Instagram webpages and content that the user has 'liked'; all information about the Instagram pages that the account is or was a 'fan' of; [and] all past and present lists of friends created by the account."  (Def.'s Mem. 23.)  This information identifies entirely appropriate locations where specific evidence relating to the Subject Offenses may be found.  As an initial matter, Defendant ignores the paragraph which precedes the section of the warrant enumerating the categories of information that Defendant asserts are overbroad, which limits the scope of the Government's review to information that relates to the Subject Offenses.  (Instagram Warrant, Attachment A at 1); *see Pugh*, 2015 WL 9450598, at *4–5, 27 (denying motion to suppress where the search warrant required Facebook to "disclose . . . a substantial amount of information" but permitted the seizure of only "information relating to [the charged offense]").  In addition, Defendant's reliance on *Shipp* is misplaced.  (Def.'s Mem. At 23 (citing *United States v. Shipp*, 392 F. Supp. 3d 300, 309 (E.D.N.Y. 2019)).)  Critically, and contrary to Defendant's argument otherwise, the court in *Shipp* did not decide the overbreadth issue, but

upheld the validity of the warrant at issue based on the good-faith exception.  *See Shipp*, 392 F.

Supp. 3d at 311 ("[T]he court need not decide whether the Facebook Warrant violated the Fourth

Amendment because, even if it did, [it] falls into the 'good[-]faith exception.'").  I find that the

Instagram Warrant was not overbroad.  Accordingly, Defendant's motion to suppress the

evidence seized from the Instagram Account is DENIED.

### 3.  Good Faith

In the alternative, the Government argues that even if the Instagram Warrant were invalid

for any of the reasons advanced by Defendant, law enforcement's reliance on the Instagram

Warrant was objectively reasonable and in good faith.  I agree.

#### a.  Applicable Law

"The fact that a Fourth Amendment violation occurred . . . does not necessarily mean that

the exclusionary rule applies."  *Herring v. United States*, 555 U.S. 135, 140 (2009).  The

Supreme Court has explained that application of the exclusionary rule has always been its "last

resort," not its "first impulse."  *Id.* (internal quotation marks omitted).  "To trigger the

exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully

deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice

system."  *Id.* at 144.

Under the good-faith exception, the exclusionary rule does not apply to "evidence seized

'in objectively reasonable reliance on' a warrant issued by a detached and neutral magistrate

judge, even where the warrant is subsequently deemed invalid."  *United States v. Falso*, 544 F.3d

110, 125 (2d Cir. 2008) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)).  "The burden

is on the government to demonstrate the objective reasonableness of the officers' good faith

reliance on an invalidated warrant."  *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011)

(internal quotation marks omitted).  "In assessing whether it has carried that burden," courts must be "mindful that, in *Leon*, the Supreme Court strongly signaled that most searches conducted pursuant to a warrant would likely fall within its protection."  *Id.*; *see also Leon*, 468 U.S. at 922 ("Searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." (citations and internal quotation marks omitted)). As the Second Circuit has explained:

> It was against this presumption of reasonableness that the Supreme Court identified four circumstances where an exception to the exclusionary rule would not apply: (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*Clark*, 638 F.3d at 100 (internal quotation marks omitted).  The critical question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."  *Leon*, 468 U.S. at 922 n.23.

### b.  Application

Defendant appears to argue that the good-faith exception is inapplicable because Detective Porter "implied that Mr. Ayala posted an incriminating video of himself on Instagram, when upon information and belief it was obtained from another website," suggesting that law enforcement knowingly misled the issuing magistrate judge.  *See Clark*, 638 F.3d at 100.  This argument is belied by the Porter Affidavit itself, which plainly states that the Instagram Account itself was set to private, making clear—as the Government states in opposition—that the video of Defendant brandishing the firearm recovered from his person during the April 25, 2022 arrest was posted somewhere other than in the Instagram Account.  (*See* Porter Affidavit ¶ 23; Gov.'s

Opp. 43.)  In addition, Defendant neither suggests, nor is there any evidence in the record to suggest, that Magistrate Judge Gorenstein abandoned his judicial role.  *See Clark*, 638 F.3d at 100.  Instead, Defendant alleges that the Instagram Warrant was "so lacking in probable cause," and that reliance on the Instagram Warrant was "unreasonable," relying wholly on arguments I have already rejected.  (Def.'s Mem. 26.)  Thus, even if the Instagram Warrant were somehow defective, which it is not, the good faith doctrine would apply and preclude suppression of the seized evidence, and Defendant's motion would be denied.

### 4.  *Franks* Hearing

Finally, Defendant claims that a *Franks* hearing is necessary to assess allegedly material misstatements and omissions in the Porter Affidavit.  Defendant has not, however, made the requisite showing necessary to justifying a *Franks* hearing.

### a.  Applicable Law

Although "a search or seizure pursuant to a warrant is presumed valid," a defendant may, "[i]n certain circumstances, . . . challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003).  "One such circumstance is where the affidavit in support of the search warrant is alleged to contain deliberately or recklessly false or misleading information."  *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir.2000).  A *Franks* hearing is required when a Defendant (1) makes a "substantial preliminary showing" that an affiant included in the affidavit "a false statement knowingly and intentionally, or with reckless disregard for the truth," and (2) demonstrates that "the allegedly false statement is necessary to the finding of probable cause."  *Franks*, 438 U.S. at 154–55.  "The *Franks* standard is a high one."  *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991).

When courts review challenges to a warrant affidavit, "[o]missions are not subject to the same high level of scrutiny as misstatements." *United States v. Rivera*, 750 F. Supp. 614, 617 (S.D.N.Y. 1990).  Omissions from a warrant affidavit "are not material unless they cast doubt on the existence of probable cause." *United States v. Marin–Buitrago*, 734 F.2d 889, 895 (2d Cir.1984).  "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Mandell*, 710 F. Supp. 2d 368, 373 (S.D.N.Y. 2010) (alterations omitted) (quoting *Awadallah*, 349 F.3d at 67–68).  This is because "allegations of omission potentially open officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Id.* (alterations and internal quotation marks omitted).  To serve as the basis for a hearing under *Franks*, an omission "must be such that its inclusion in the affidavit would defeat probable cause." *Mandell*, 710 F. Supp. 2d at 374 (S.D.N.Y. 2010) (quoting *United States v. Colkley*, 899 F.2d 297, 300–01 (4th Cir. 1990)).  "Omitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing." *Id.* (internal quotation marks omitted).

b.  Application

As an initial matter, Defendant does not identify any specific misstatements in the Porter Affidavit, instead relying solely and generally on his challenge to the validity of the identification procedures.  (*See* Def.'s Mem. 27 ("The warrant also contains misstatements relating to the identification procedures.").)  To the extent that Defendant suggests that the Porter Affidavit—which, in support of probable cause, recounts the underlying substance of the identification procedures—contains material misstatements due to the impropriety of the procedures themselves, this argument fails for the same reason his motion to suppress the

identification evidence fails.  (*See* Porter Affidavit ¶¶ 14–15; *supra* Section III.B.)  In addition, the information in the Porter Affidavit relating to these procedures is entirely consistent with the information reflected elsewhere in the record.  (*See* Def.'s Mem. Exs. A–D.)

Defendant similarly fails to identify any material misstatements or instances where Agent Porter acted with a reckless disregard for the truth, *see Franks*, 438 U.S. at 154–55, which would require Defendant to establish that certain omitted information be "clearly critical" to assessing the legality of the search.  *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) (internal quotation marks omitted).  Instead, Defendant suggests that the Porter Affidavit should have disclosed that there was "no evidence that Ayala posted on the Instagram Account or communicated with anyone on Instagram, let alone that he did so about acquiring and disposing of firearms, details of any shootings or how to evade law enforcement."  (Def.'s Mem. 27.)  Requiring such information to be included in search warrants would lead to the impractical result that such a disclosure would have to be included in nearly every application to search a private Instagram Account.  *See Mandell*, 710 F. Supp. 2d at 374.  Such information is precisely the evidence that the Instagram Warrant sought to unearth.  Therefore, even assuming that any necessary facts were omitted, which is not the case, any such omission would be immaterial to Magistrate Judge Gorenstein's probable cause determination.  Therefore, Defendant's motion to suppress the evidence obtained from his Instagram Account, and his request for a *Franks* hearing is DENIED.

**IV.**  <u>**Conclusion**</u>

For the foregoing reasons, Defendant's motion is DENIED in its entirety.  The Clerk of

Court is respectfully directed to terminate the open motion at Doc. 34.

SO ORDERED.

Dated: July 11, 2024
       New York, New York

_Vernon Broderick_
Vernon S. Broderick
United States District Judge